ORDERED.

**Dated:  November 27, 2017**

Cynthia C. Jackson
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**
**www.flmb.uscourts.gov**

In re:                                                      CASE NO.:  6:17-bk-04444-CCJ

THE GARDENS, LLC,                            CHAPTER 11

                        Debtor.
_____/

**ORDER APPROVING DISCLOSURE STATEMENT AND CONFIRMING**
**PLAN OF REORGANIZATION, AS MODIFIED, SUBMITTED BY**
**THE GARDENS, LLC**

THIS CASE came on for hearing on November 9, 2017 ("Hearing") to consider approval

of:  (a) the Disclosure Statement Pursuant to 11 U.S.C. § 1125  (the "Disclosure Statement") (Doc.

No. 34) submitted by The Gardens, LLC ("Debtor"); (b) the Debtor's Plan of Reorganization (the

"Plan") [1] (Doc. No. 35); (c) the Modification to the Plan (the "Modification") (Doc. No. 50); (d) the

*ore tenus* modifications to the Plan announced by Debtor's counsel at the Hearing (the "*Ore Tenus*

Modifications") (the Plan, as modified by the Modification and the *Ore Tenus* Modifications, is

referred to as the "Plan"); (e) the Objection to Debtor's Plan of Reorganization and Disclosure

---

[1] Capitalized terms not defined herein have the meanings ascribed to them in the Plan and the Modification.

Statement filed by the United States Trustee to Confirmation of Debtor's Plan (Doc. No. 53) (the

"UST Objection"); the Confirmation Affidavit (Doc. No. 57); the Ballot Tabulation (Doc. No. 56);

Motion by Debtor Pursuant to Section 1129(b) for Cramdown ("Cramdown Motion") (Doc. No. 58);

and Motion by Debtor to Accept Late-Filed Ballot ("Late Ballot Motion") (Doc No. 62).  The Plan

and Disclosure Statement were timely transmitted to all creditors and interest holders.

Pursuant to Local Rule 3020-1, the filed Modifications and *Ore Tenus* Modifications to the

Plan are as follows:

A.    **<u>ARTICLE I. – DEFINITIONS</u>.**

1.    The following definitions were revised as follows:

**CMM** means Commercial Mortgage Managers, Inc., mortgage servicer

for the Trustee and other Mortgage Participants as defined in paragraph 58 below. The term

CMM also collectively refers to the Trustee, CMM and Loan Subservicer where appropriate.

**Judgment Lien** means the lien against the Debtor's Real Property arising

out of the Judgment in the Foreclosure Action.

2.    The following definitions are added and all subsequent definitions are

renumbered:

**Guarantor** means Mr. M. Donald Granatstein.  All subsequent definitions

are renumbered accordingly.

**Nevada Case** shall mean Asset Resolution Chapter 7 case now pending in

the United States Bankruptcy Court for the District of Nevada, Case No. BK-S-09-32824 RCJ.

B.      **ARTICLE II. – CLASSIFICATION OF CLAIMS AND INTERESTS.**

Class 5 – Allowed Secured Claim of Asset Resolution, LLC/Commercial Mortgage Managers.

Class 5 consists of the Allowed Secured Claim of William A. Leonard, as Chapter 7 Trustee for the estate of Asset Resolution, LLC (the "Trustee"), Commercial Mortgage Managers, Inc. ("CMM"), as servicer for the Trustee and the other Mortgage Participants, and Gardens Recovery Partners, LLC ("GRP") (Trustee, CMM and GRP shall be collectively referred to herein as GRP where appropriate). The Allowed Class 5 Claim relates to the Judgment Lien and certain mortgage obligations held by Asset Resolution, LLC and the individual Mortgage Participants. Class 5 is Impaired.

C.      **ARTICLE IV – TREATMENT OF UNIMPAIRED CLASSES OF CLAIMS**

Class 5 – Allowed Secured Claim of Asset Resolution, LLC/Commercial Mortgage Managers

Class 5 consists of the Allowed Secured Claim of William A. Leonard, as Chapter 7 Trustee for the estate of Asset Resolution, LLC (the "Trustee"), Commercial Mortgage Managers, Inc. ("CMM"), as servicer for the Trustee, and Gardens Recovery Partners, LLC ("GRP") (Trustee, CMM and GRP shall be collectively referred to herein as GRP where appropriate). The Allowed Class 5 Claim relates to the Judgment Lien and certain mortgage obligations held by Asset Resolution, LLC and the individual mortgage participants (the "Mortgage Participants"). Pursuant to the Settlement Agreement entered into by the Debtor, Granatstein, Unger, and GRP a copy of which is attached as Exhibit "A"[2], and whose terms are incorporated herein, and in full satisfaction of GRP's Allowed Class 5 Claim, GRP shall retain

---

[2]      The Settlement Agreement is attached as Exhibit A to the Modification.

an Allowed Secured Claim in the amount of $1,500,000.00 which shall be repaid as follows pursuant to the Settlement Agreement:

(i)     On or before 90 days after the Effective Date of the Plan, the Parking Lot, Trustee's Lot, and Cross Parcel (collectively the "Sale Property"), but not the Main Property, shall be sold to a third party (unaffiliated with the Debtor or Guarantor), and the Judgment Lien shall be released on the Sale Property in exchange for payment to GRP, at closing, of $1,200,000.00 ("Sale Release Price"). In connection with such sale, Trustee will release the Trustee's Mortgage on the Trustee's Lot.  The release of the ARC mortgage and the Trustee's Mortgage will not happen except after, concurrently with, or as part of the same escrow as the recordation of the New Mortgage and payment of the Sale Release Price.  Debtor understands that GRP, CMM, and Trustee cannot release the mortgage (the "Cross-Mortgage") on the Cross Parcel. However, GRP, CMM, and Trustee make no warranty or representation with respect to the Cross Mortgage or with respect to the title to any of the Sale Property, or any other warranties or representations of any kind.

(ii)    Upon closing of the Sale Property, Debtor shall execute and deliver to GRP a new renewal note ("New Note") in the amount of $300,000.00 and a first priority mortgage lien on the Main Property (including the Weekly Intervals), as well as Debtor's interest in the personal property in the units (GRP acknowledges that the personal property in The Gardens Condominium units is owned by the Condo Association), to provide additional security for the remaining portion of the Secured Claim owed to GRP (the "New Mortgage").  The New Note shall be co-signed (or guaranteed, at GRP's option) by Guarantor and Unger, jointly and

4

severally, and will accrue regular non-default interest at the rate of 5% per annum, and upon default, at the highest rate allowed by Florida law.  GRP shall also retain its existing Mortgages, Judgment, and Judgment Lien to secure said reduced amounts, and may reschedule the foreclosure sale under its Judgment and/or pursue its other remedies without further order of the bankruptcy court in the event of a default by Debtor under the confirmed Plan or under the New Note, New Mortgage, or this Agreement, until such time as GRP provides a release (or with respect to a specifically released portion of the property, a partial release) of such mortgages or liens pursuant to the terms hereof.  Provided, however, notwithstanding any other term or provision of this Agreement, the Sale Property shall be released from the existing Mortgages, Judgments, Lien, and Judgment upon payment of the Sale Release Price to GRP and execution and delivery of the New Mortgage and New Note pursuant to the Plan.  Upon issuance of the New Mortgage, Debtor shall provide title insurance with respect to the New Mortgage at Debtor's expense, which must be reasonably acceptable to GRP and the Trustee.

(iii)    During the first six months after the Effective Date of the Plan, the New Note will not have any required monthly payments if there are no sales of timeshare "points" associated with a Weekly Interval (the "Points"). However, the Debtor shall diligently market and attempt to sell the Points, and GRP shall, at the closing of each sale of a Points, receive $1,200.00 cash for each sale of Points corresponding to one Weekly Interval ("GRP Portion"). Each buyer shall be a *bona fide* purchaser unaffiliated with Debtor or Guarantor. Upon receipt by GRP of the GRP Portion for each sale of Points corresponding to one Weekly Interval,

GRP shall promptly provide a written Partial Release of Mortgage in recordable form executed by an authorized officer of GRP to release such Weekly Interval from the New Mortgage.  In the event that, after a default by the purchaser, Debtor or its affiliates retake ownership of any Weekly Interval or Points, or any paper secured by such Weekly Interval or Points, Debtor shall assign or mortgage the same to GRP as additional collateral for the New Note. Following the first six-month period referenced in paragraph 2.1(iv) of the Settlement Agreement, for each month thereafter, Debtor shall continue to make payments on the same terms as those described in paragraph 2.1(iv), for each Weekly Interval or Points sold, except that if the payments to GRP during any given month are less than $5,000.00, then Debtor shall pay an additional sum to GRP at the end of each such month to increase the amount paid to GRP in that month to $5,000.00

(iv)   The Balance of the New Note shall balloon, mature, and come due in full, forty-eight (48) months after the date of issuance of the New Note. In addition, the New Note shall permit acceleration in the event of default under the New Note, New Mortgage, the Settlement Agreement, or the Plan. Upon payment of all sums due or to come due to GRP under the New Note, New Mortgage, and the Settlement Agreement, CMM and GRP shall satisfy the New Note, New Mortgage, the secured portion of the Judgment, Renewal Mortgage, Mortgage 1, Amendment 1, Amendment 2, and Mortgage Modification (as defined in the Settlement Agreement) that are held by GRP.

(v)   Pursuant to the Plan, CMM, GRP, and Trustee shall retain their existing mortgages and liens until they are voluntarily released by them as provided in the Settlement Agreement, and shall retain their existing rights, as modified herein.

The Sale Property shall be released from all mortgages, liens, and judgments on the payment of the Sale Property Release Price to GRP.  The parties understand that pursuant to Section 3-310 of Florida's version of the UCC, the acceptance by CMM and GRP of the New Note does not discharge the Judgment or the obligations on which the Judgment is based, but rather suspends them until the New Note comes due. In the event of a default under the New Note, CMM and/or GRP may enforce the New Note and/or the Judgment and the underlying obligations upon which the Judgment is based. In the event that CMM or the GRP seeks to enforce the Judgment, Borrower consents to the entry of an order rescheduling the sale. If CMM or the GRP determines that the amount of the Judgment should be reduced to account for any payments made after entry of the Judgment, then Debtor consents to such modifications of the Judgment upon the filing of an affidavit by GRP or CMM setting forth the reasons for such modification.

(vi)    Reorganized Debtor shall, or shall cause the Association to maintain the Main Property, including the Weekly Intervals, and to keep the Main Property and Weekly Intervals properly insured at its own expense, with a lender loss payee clause listing GRP as a payee (to the extent that CMM or GRP has an insurable interest), and shall provide proof of the payment of the premium to CMM or GRP.

(vii)    At its own expense, Debtor shall pay or cause to be paid all real estate taxes and other assessments (including condominium and maintenance assessments) upon all timeshare intervals and common areas within The Gardens Condominium (including the Main Property and Weekly Intervals) on a going forward basis, and the accrued taxes and other accrued assessments shall be paid under the Plan as

provided in Chapter 11.  However, the Debtor agrees that no funds will be transferred or loaned from its affiliate, Parliament.  Debtor shall provide proof of such payment to CMM or GRP.  In the event that any person seeks to enforce a tax lien or other lien superior to GRP's Secured Claim, such event shall constitute a default of Debtor's obligations under the Plan, this Agreement, and the documents evidencing the Loan.

(viii)   The Parliament Vacation Club, LLC, shall be responsible for funding the operating expenses of the Reorganized Debtor's timeshare business, and for marketing the Points pursuant to a subordinated management and marketing contract, the terms of which shall be subject to approval by CMM, GRP, and Trustee, as well as the Bankruptcy Court with jurisdiction over the Bankruptcy Case. Reorganized Debtor shall provide a proposed budget to GRP at the commencement of each calendar quarter. CMM or GRP shall have access to the books and records of Reorganized Debtor and its affiliates to confirm that the operating expenses have been paid.  Reorganized Debtor agrees that it will not allow Parliament to fund or loan funds to cover any operating expenses of Reorganized Debtor.  However, Parliament intends to enter into a lease to use the Parking Lot after the sale of the Sale Property, and CMM, GRP, and the Trustee do not object to such lease, provided that the terms are based on market rates and will not burden Reorganized Debtor so much that it renders the Plan unfeasible.

(ix)   GRP shall be entitled to assert an unsecured deficiency claim under the Plan for the amount of its Judgment in excess of the Secured Claim, and shall vote in favor of the Plan, provided that the Plan complies with the terms of this Agreement. However, when and if Debtor pays the Sale Property Release Price and delivers to

8

GRP the executed New Note and New Mortgage, the unsecured deficiency against the Debtor shall be discharged, and on a going forward basis, shall receive no further payment under the Plan on account of its unsecured deficiency, but this discharge shall not affect the liability of the Guarantor and Unger under the New Note or under the Guaranty and Guaranty Judgment.  Trustee shall be entitled to an unsecured claim for the obligation secured by the Trustee's Mortgage, and shall vote in favor of the Plan, provided that the Plan complies with the terms of this Agreement.  However, when and if Debtor pays the Sale Property Release Price and delivers to GRP the executed New Note and New Mortgage, the Trustee's unsecured claim against the Debtor shall be discharged, and on a going forward basis, shall receive no further payment under the Plan on account of its unsecured claim, but this discharge shall not affect the liability of the Guarantor and Unger under the New Note or under the Guaranty and Guaranty Judgment.

D.    **ARTICLE VII. – MEANS OF IMPLEMENTATION.**

Pursuant to the purchase agreement between Lion Gardens, LLC ("Purchaser") on the one hand and The Gardens, LLC on the other hand, executed on November 9, 2017 and announced at the Hearing (the "Purchase Agreement")[3], the Sale amount was increased to $1,700,000.00.

$1,700,000 Sale to Purchaser.

The Plan is premised on the closing of the Sale of the Sale Property for $1,700,000.00 to Purchaser. The Plan contemplates the Debtor will utilize the Sale Proceeds to pay its creditors in accordance with the treatment outlined above in Article IV. Specifically, Debtor anticipates the Sale will result in a net benefit to the estate of $1,700,000.00 (the "Sale

---

[3]    A true and correct copy of the Purchase Agreement is attached hereto as **Exhibit "A."**

Proceeds), $500,000.00 of which will be distributed to pay the outstanding secured tax claims described in Classes 1, 2, and 4, with the balance of the Sale Proceeds distributed to GRP in accordance with the terms outlined in Class 5 above. Additionally, in connection with the Sale, Parliament will enter into a sale-leaseback arrangement ("Lease") with Purchaser pursuant to which the Reorganized Debtor and Parliament will have access to the Parking Lot.

      E.        **ARTICLE VIII. - MISCELLANEOUS**.

      As announced at the Hearing, the following *ore tenus* modifications are applicable:

      F.        **CONDITIONS TO EFFECTIVENESS**.

      The Effective Date shall not occur until: (i) the entry of the Confirmation Order by the Bankruptcy Court; (ii) expiration of the appeal period with respect to the Confirmation Order without the filing of a notice of appeal of such order; (iii) the Sale has closed; and (iv) the Trustee in the Nevada Case has obtained approval of the Plan by the Nevada Bankruptcy Court. If the above conditions do not occur within sixty (60) days of entry of this Order, the Effective Date will not occur, and the Confirmation Order shall be deemed null and void and of no further force or effect. The Effective Date shall automatically occur without further order of the Bankruptcy Court, provided that all of the conditions to effectiveness of the Plan set forth herein have been met.

      G.      The section titled Exculpation from Liability is deleted in its entirety.

      After hearing on proper notice, and upon review of the Confirmation Affidavit, the Ballot Tabulation, and the Plan, and the proffer of testimony set forth at the Hearing, considering the Cramdown Motion, the Late Ballot Motion, the UST Objection, the Court finds that the Modifications and the *Ore Tenus* Modifications are either nonmaterial or do not adversely change

the treatment of the claim of any creditor or holder of an equity interest who has not accepted the modifications in writing, and that no further solicitation of the Plan, as modified, is required.

Upon consideration of the Plan, Confirmation Affidavit and the evidence and testimony presented aat the Hearing, and for the reasons stated orally and recorded in open court, the Court finds and determines that the requirements set forth in 11 U.S.C. § 1125 and 11 U.S.C. § 1129(a) and (b) of the Bankruptcy Code have been satisfied.

Accordingly, it is **ORDERED** as follows:

1.  The Disclosure Statement is **APPROVED**.

2.  The Plan as modified is **CONFIRMED**.

3.  The Cramdown Motion and Late Ballot Motion are **GRANTED**.

4.  As part of Confirmation, the UST Objection is deemed withdrawn.

5.  The Debtor is authorized to execute all agreements and take all needed actions to consummate the Plan.

6.  The Debtor shall file all objections to claims or motions to reject within ninety (90) days of the Effective Date of the Plan.

7.  Pursuant to the Plan and in accordance with § 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of securities pursuant to the Plan, or the transfer of, or creation of any lien on, any property of the Debtor pursuant to the Plan or pursuant to an Order of the Court, shall not be taxed under any law imposing a stamp tax, transfer tax, recordation tax, or similar tax.

8.  The Debtor shall pay all fees owing to the Office of the United States Trustee within thirty (30) days of entry of this Order for preconfirmation periods and simultaneously file with the Court the appropriate financial reports indicating the cash disbursements for the relevant period. The Debtor shall continue to pay quarterly fees assessed pursuant to 28 U.S.C. § 1930(a)(6) until

such time as this Bankruptcy Court enters a final decree closing the Debtor's case or enters an order either converting or dismissing the case.

9.      The Debtor shall file with the Bankruptcy Court post-confirmation financial reports for each quarter (or portion thereof) that the Debtor's Chapter 11 case remains open, in the format prescribed by the United States Trustee, until the case is converted or dismissed.

10.     Debtor shall file a Certificate of Substantial Consummation and a Motion for Final Decree with thirty (30) days after the later of:

      a.      the Effective Date of the Plan; or

      b.      disposition of all objections to claims, adversary proceedings and other contested matters.

11.     The Debtor shall file a report within ninety (90) days from the date of this Order of Confirmation if the case remains open.  The report shall include:  (1) a statement of distribution by class, name of creditor, date of distribution, and amount paid; (2) a statement of transfer of property; and (3) a statement of affirmation that the Debtor has substantially complied with the provisions of the confirmed Plan.

12.     The Court retains jurisdiction for any and all matters that may come before the Court in the administration of the Plan and pursuant to the Order of Confirmation, specifically including but not limited to, the jurisdiction to determine all objections that have heretofore been or may be filed to claims of creditors; to fix and award all compensation to parties who may be so entitled; to hear and determine all questions concerning the assets or property of the Debtor, including any questions relating to any sums of money, services, or property due to the Debtor; and determine all matters of any nature or type necessary or appropriate to carry out the Plan.

13.     Any claim arising from the rejection of an executory contract or unexpired lease of the Debtor shall be filed with the Court no later than thirty (30) days after the Effective Date

or entry of an order rejecting such agreement, whichever is later.  Absent the timely filing of

such claims, such claims shall be forever barred and disallowed without further order of this

Court.

       14.     <u>Specific Findings as to the Sale and Purchase and Purchase Agreement.</u>

       a.     The sale of the Sale Property shall be free and clear of all liens and

encumbrances, and any liens and encumbrances shall attach to the proceeds of the Sale as more

fully set forth in the Plan.

       b.     The Debtor is authorized to sell the Sale Property to Purchaser (or a

successor or a permitted assign) under the sale agreement entered into by the Debtor and Lion

Gardens, LLC, dated November 9, 2017 ("Purchase Agreement"), pursuant to authority contained

in 11 U.S.C. § 1129(b)(2)(A)((ii).

       c.     The Purchase Agreement constitutes a valid and binding contract.

       d.     The terms and conditions of, and the transactions contemplated by, the

Purchase Agreement, as defined in the Plan and modified herein, are hereby approved; the Sale

and all related transactions contemplated thereby are hereby approved as modified herein and

authorized and directed under 11 U.S.C. § 1129. To the extent a conflict arises between the

Purchase Agreement or any documents related to the Sale Property, and this Order, the Purchase

Agreement shall control.

       e.     Pursuant to 11 U.S.C. § 1129, the Debtor is hereby authorized, directed,

and empowered to fully assume, perform under, consummate, and implement the Purchase

Agreement, together with all additional instruments and documents that may be reasonably

necessary or desirable to implement the Purchase Agreement and the related transactions

contemplated thereby, and to take all further actions as may be reasonably requested for the purpose of assigning, transferring, granting, conveying, and conferring to the Purchaser, the Sale Property of the Debtor, or as may appropriate to the performance of the Debtor's obligations as contemplated by the Purchase  Agreement.   Without limiting the foregoing, the Debtor is authorized and directed, without further order of this Court, to make any and all transfers that are required to be made by the Debtor under the Purchase  Agreement.

      **15.**    **The Court expressly reserves jurisdiction to hold post-confirmation hearings as necessary and enter any additional Orders that may be required to allow the Debtor and the Purchaser to close on the Sale of the Sale Property pursuant to the terms of the Purchase Agreement.**

      **16.**    **A status conference in this case is scheduled for Thursday, January 25, 2018 at 2:45 p.m.**

Attorney R. Scott Shuker, Esq. is directed to serve a copy of this order on interested parties and file a proof of service within 3 days of entry of the order.

## CONTRACT FOR SALE AND PURCHASE

**THIS CONTRACT FOR SALE AND PURCHASE** (this **"Contract"** or **"Agreement"**) is made and entered into as of this _____ ___, 2017 by and between **THE GARDENS LLC,** a Florida limited liability company (**"Seller"**) and **LION GARDENS, LLC,** a Florida limited liability company, or its assigns (**"Buyer"**).

**FOR AND IN CONSIDERATION** of Ten Dollars ($10.00), the mutual agreements herein contained and other good and valuable considerations the receipt and sufficiency of which are hereby acknowledged by Seller and Buyer, Seller and Buyer hereby covenant and agree as follows:

### RECITALS:

A.    Seller is the record owner of fee simple title to the real property located on North Orange Blossom Trail, Orlando, Florida and more particularly described in **Exhibit "A"** attached hereto and incorporated herein (**"Land"**).

B.    Seller desires to sell and convey to Buyer and Buyer desires to purchase from Seller on the terms and subject to the conditions as more particularly set forth herein all of the Land, together with all of Seller's right, title and interest in and to, if any (i) all improvements of every nature whatsoever owned by Seller and located in or on, or attached to, the Land (the **"Improvements"**) and (ii) all easements, rights of way, gores of land, streets, ways, alleys, passages, sewer rights, waters, water courses, water rights and powers, and all estates, rights, titles, interests, privileges, liberties, tenements, hereditaments and appurtenances whatsoever, in any way belonging, relating or appertaining to the Land, all in its **"as-is"**, "where-as" condition (collectively, the **"Property"**).

### TERMS AND CONDITIONS

1.    **Recitals**. The recitals set forth above are true and correct and they are incorporated herein by this reference.

2.    **Agreements to Buy and Sell**. Seller agrees to sell, and convey the Property to Buyer and Buyer agrees to purchase the Property from Seller upon the terms and conditions set forth in this Contract.

3.    **Purchase Price and Manner of Payment**. The purchase price to be paid to Seller by Buyer for the Property (**"Purchase Price"**) shall be ONE MILLION SEVEN HUNDRED THOUSAND AND 0/100 U.S. DOLLARS ($1,700,000.00). The Purchase Price, less any portion of the Deposit held in cash, plus or minus proration and other adjustments as provided for hereinafter, shall be "paid by Buyer" (as hereinafter defined) before 1:00 P.M. (local time in Orange County [the "County"]) on the **"Closing Date"** (as hereinafter defined in Section 7.1). As used herein, the terms **"paid by Buyer,"** shall mean payment by electronic wire transfer of immediately available funds or in an equivalent manner. Such funds shall be deemed to be **"paid by Buyer"** at the point in time when the bank to which the funds are sent receives such funds, as confirmed by such bank.

**EXHIBIT A**

4.      **Deposit**. Upon execution of this Contract by Buyer and Seller, Buyer shall deliver to Shutts & Bowen, LLP, as escrow agent (**"Escrow Agent"**) the sum of FIVE THOUSAND AND 0/100 DOLLARS ($5,000.00) (the **"Deposit"**) and the Deposit shall be non-refundable except in the event of a default by Seller hereunder or as otherwise expressly provided in paragraphs 5, 6, 15 and 37 below. The Deposit shall be held, disbursed by Escrow Agent in accordance with this Contract.

5.      **Title and Survey Matters**.

5.1      Title Commitment. Within ten (10) days after the Effective Date, Seller shall deliver to Buyer a title insurance commitment covering the Property and any easements that benefit the Property (**"Commitment"**) issued by Shutts & Bowen LLP (**"Title Agent"**) on First American Title Insurance Company, or another national title insurance company selected by Seller (**"Title Company"**) committing to issue to Buyer an owner's title insurance policy for the Property in the amount of the Purchase Price.  No later than seven (7) days prior to the Closing, Buyer may request an endorsement to the Commitment (**"Update Endorsement"**) that updates the effective date of the Commitment. The Commitment and Update Endorsement shall be accompanied by copies of all documents referenced therein. The Commitment shall show that Seller is vested with and can convey to Buyer good, marketable and insurable fee simple title to the Property, free and clear of all liens, encumbrances, objections, defects and exceptions, except the following, (herein called the **"Permitted Exceptions"**):

5.1.1    Buyer will accept title subject to Real Property taxes, assessments and special district levies, for the year in which the Closing occurs, and prior years taxes which shall not be prorated as provided for herein, and for subsequent years;

5.1.2    Zoning and other regulatory laws and ordinances affecting the Property.

5.1.3    Matters set forth in Schedule 5.1.3 attached hereto and incorporated herein; and

5.1.4    Mortgages and liquidated liens and judgments which can be and shall be discharged by Seller out of the cash **"paid by Buyer"** at Closing.

Buyer shall have until ten (10) days from receipt of the Commitment within which to cause the Title Evidence to be examined and to notify Seller in writing of any objections (other than for Permitted Exceptions) (**"Buyer's Notification"**) to Seller's title reflected by the Title Evidence (**"Title Defects"**). If, after ten (10) days from Seller's receipt of Buyer's Notification, Seller fails or is unable to cure or remove any Title Defects prior to the Scheduled Closing Date, as extended, Buyer, at Buyer's sole option may:

A.      Accept title to the Property in its then existing condition; or

B.      Terminate this Contract by written notice to Seller, at which time the Contract will be null and void and the parties hereto will have no further rights or obligations hereunder as to any part of the Property, except for those obligations which specifically survive termination

**EXHIBIT A**

hereunder. Upon such termination and release of rights and obligations, the Deposit shall be returned to Buyer.

Notwithstanding anything herein to the contrary, except for existing mortgages, which Seller shall be obligated to discharge on or before Closing, in no event shall Seller be deemed to have any obligation to cure any Title Defects.

5.2    Survey. Buyer may obtain a survey of the Property prepared by a duly licensed property surveyor in the State and shall provide copies of same to the Title Agent and to Seller. The cost of said survey shall be borne by Buyer. Buyer shall have until the deadline for Buyer's Notification within which to cause the Survey to be examined and to notify Seller of any objections thereto. If, after due diligence, Seller fails or is unable to cure or remove any objections of Buyer within ten (10) days of notification of any objections from Buyer. Buyer, at Buyer's sole option, may:

A.    Accept the Property in its then existing condition; or

B.    Terminate this Contract by written notice to Seller, at which time this Contract will be null and void and the parties hereto will have no further rights or obligations hereunder as to any part of the Property except for those obligations which specifically survive termination hereunder. Upon such termination and release of rights and obligations, the Deposit shall be returned to Buyer.

Notwithstanding anything herein to the contrary, in no event shall Seller be deemed to have any obligation to cure any objections of Buyer with respect to the Survey.

6.    **Inspection Period**.

6.1    Buyer shall have until 5:00 P.M. (local time in the County) on the twentieth (20th) day after the Effective Date (the **"Inspection Period"**) in which to conduct at Buyer's sole expense, except as otherwise provided herein, such investigations and inspections as to the Property, the physical condition thereof, matters of zoning and all other matters with respect to the Property which are in Buyer's judgment relevant to Buyer's determination whether to purchase the Property or to terminate this Contract. In the event that a Phase II environmental study is recommended, the Inspection Period shall be extended sufficient time to enable Buyer to evaluate the results of the inspection. Buyer's evaluation of the Property shall not interfere with Seller's use of the Property, and shall not violate any law or governmental regulation. Buyer shall indemnify Seller from and against any loss, damage, cost or expense incurred by Seller as a result of Buyer's inspection of the Property, and Buyer shall, following any such inspections, promptly restore the Property to the condition existing immediately prior to such inspections (it being understood that the foregoing indemnity and obligation to restore shall specifically survive Closing or any termination of this Contract). Prior to Buyer, except for a visual inspection, or any Contractor or other person or entity acting on behalf of Buyer entering upon the Property, Buyer or the contractor shall obtain, and keep in force during the term of this Contract, polices of commercial General liability and contractual liability from an insurance company licensed to do business in the State of Florida insuring the Buyer and/or its contractors in an amount not less than One Million and No/100 Dollars ($1,000,000.00) and shall provide Seller with a certificate

**EXHIBIT A**

evidencing such insurance in a form acceptable to Seller and naming Seller as the additional insured on the certificate prior to any entry by Buyer or its consultants, contractors, or agents on the Property.

6.2     If for any reason whatsoever or no reason, in Buyer's sole and absolute discretion, Buyer determines during the Inspection Period that it does not wish to purchase the Property and to close the transaction contemplated hereby, Buyer shall have the absolute right to terminate this Contract by giving written notice of such termination to Seller in the manner hereinafter provided for the giving of notices, prior to the expiration of the Inspection Period. Upon receipt of such notice, the Deposit shall be returned to Buyer and thereafter this Contract shall be deemed terminated and of no further force and effect and both parties shall be released and relieved of any liability or obligations hereunder, except for those that specifically survive termination hereof. Additionally, after the Buyer has provided the notice of termination of the Contract to Seller, the Buyer shall return to the Seller all Property Information (as hereinafter defined) to the Seller. However, the return of the Property Information to the Seller shall not affect or delay the return of the Deposit to Buyer. If Buyer does not provide notice of termination prior to the expiration of the Inspection Period, then it shall be presumed conclusively that Buyer is satisfied with its investigation, and thereafter Buyer shall have no further right to terminate this Contract in accordance with the provisions of this **Section 6**, and, subject to the provisions of **Section 19** (**"Remedies for Default"**) hereof, shall be obligated to close the transaction contemplated herein on the Closing Date.

6.3     Seller shall, within three (3) days of the Effective Date, deliver to Buyer or its agents the following documents, to the extent within its possession and/or control:   copies of any title policies, surveys, environmental audits, engineering studies, plats, leases, association documents, development plans, traffic studies, site plans, insurance policies, notices of violations from governmental agencies and other similar documents or information (collectively, the **"Property Information"**) and if this Contract is terminated for any reason, Buyer shall return the Property Information to Seller upon the termination of this Contract. It is the parties' express understanding and agreement that to the extent any Property Information is provided, it is provided only for Buyer's convenience in making its own examination and determination as to whether it wishes to purchase the Property, and, in doing so, Buyer shall rely exclusively on its own independent investigation and evaluation of every aspect of the Property and not on any materials supplied by Seller or Seller's agents.  Seller makes no representations or warranties whatsoever as to the completeness or accuracy of any Property Information. An estoppel letter(s) , if applicable, shall also be delivered to Seller prior to the expiration of the Inspection Period.

7.     **Closing**.

7.1     <u>Closing Date</u>. The consummation of the purchase and sale of the Property as contemplated by this Contract (the **"Closing"**) shall take place on or before twenty (20) days after the expiration of the Inspection Period (the **"Closing Date"**) at the offices of the Title Agent. The Closing may also be done as a **"mail away closing"** or escrow closing in which all required documents and funds are provided to the Title Agent and disbursed by the Escrow Agent to the appropriate parties or entities; provided that all required documents and funds must be received by the Title Agent on or before the Closing Date.

**EXHIBIT A**

7.2     Time of the Essence. Time shall be of the essence with respect to Buyer's obligation to consummate the Closing on the Closing Date.

8.      **Closing Expenses**.

8.1     Seller shall pay for state documentary stamps and any surtax imposed by the county in which the property is located required to be affixed to the deed, the title insurance premium and other costs associated with issuing, updating and endorsing the Commitment and Policy, municipal lien search to be ordered by Buyer, the cost to record the deed to Buyer, the cost to prepare and record any instrument required to cure any Defect, and any other expense agreed in this Contract to be paid by Seller.

8.2     Buyer shall pay the cost of any survey, the cost of any endorsements to the Owner's Policy and the costs associated with any lender's recorded documents and any other expense agreed in this Contract to be paid by Buyer.

8.3     All other expenses shall be paid by the parties as may be customary in the County. Except as provided in Section 19, each party shall bear its own attorney, paralegal and consultant fees and disbursements in connection with this Contract and the Closing.

9.      **Taxes and Assessments**. Real and personal property taxes (if any), assessments and special district levies shall not be prorated.  Buyer expressly acknowledges that Buyer is purchasing the Property subject to delinquent taxes.   Certified, confirmed, and ratified special assessment liens, if any, as of the Closing are to be paid by Seller and shall be prorated as aforesaid if payable over a period of time. Pending liens as of the Closing shall be assumed by Buyer.

10.     **Closing Deliveries**. At Closing, the party indicated shall deliver or cause to be delivered to the other the following:

10.1    Deed. Seller shall deliver to Buyer a special warranty deed (the **"Deed"**) in recordable form conveying the Property to Buyer subject to the Permitted Exceptions.

10.2    Purchase Price. Buyer shall deliver to Seller the Purchase Price, less any portion of the Deposit held in cash, plus or minus any other proration and other adjustments to be made in accordance with this Contract.

10.3    Resolutions. Each party shall deliver certified resolutions and such other instruments as may be required by the Title Agent, evidencing the authority of such party to enter into and perform this Contract and to perform such party's obligations hereunder.

10.4    Settlement Statement. Each party shall deliver a counterpart, executed by each party, of a summary statement describing in detail the consideration, prorations, adjustments, costs and expenses associated with this transaction (**"Settlement Statement"**).

10.5    Other Documents. Such other documents and instruments as are contemplated hereunder or as may be reasonably and customarily required by Seller, Buyer, their respective counsel and/or the Title Agent and necessary to consummate this transaction and to

**EXHIBIT A**

otherwise effectuate the agreements of the parties hereto, including , but not limited to a no lien/ construction lien  affidavit with "Gap" language, FIRPTA affidavit, bill of sale, and assignment of leases, if applicable.

11.    **Possession**. Seller shall deliver exclusive possession of the Property to Buyer at the Closing, subject to leases, survey encroachments and Permitted Exceptions.

12.    **Representations**. Seller represents to Buyer that (a) Seller is a limited liability company duly organized and existing in good standing under the laws of Florida; (b) Seller has full power and authority to enter into this Contract and to comply with the terms of this Contract; (c) all requisite action has been taken to make this Contract valid and binding on Seller in accordance with its terms; and (d) the person signing this Contract on behalf of Seller is fully authorized to do so.

12.1..  The Seller owns the entire fee simple interest in the Property free and clear of all liens and encumbrances other than the Permitted Exceptions.

12.2.  Seller has not received any notices from any governmental authority, or quasi-governmental authority, or any insurance carrier, of zoning, building, fire or health code violations, or other violations in respect to the Property, except as shown in the Inspection Materials delivered to Buyer.

12.3.  To the best of Seller's knowledge, Seller has not voluntarily committed any act or suffered or permitted the occurrence of any transaction, event or action which prohibits or in any way impedes or hinders the complete performance by the Seller of all of the duties and obligations required of them by, under or pursuant to this Agreement in accordance with all of its terms and conditions.

12.4  The Seller has not been served with notice of, and there are no actions, suits or proceedings (other than bankruptcy) , including but not limited to those involving environmental violations, pending in any court, tribunal, agency, or other forum, or threatened, against or affecting the Property or any interest of the Seller therein or which would affect the Seller's ability to consummate the transactions contemplated herein and there are no outstanding and unpaid or unrecorded arbitration awards against the Seller affecting title to the Property or any portion thereof.

12.5.  The Seller has not, and between the date hereof and the Closing, will not, with respect to and/or affecting the Property (a) incur any obligations or liabilities not in the ordinary course of business; (b) mortgage, pledge or subject to lien or encumbrance any of its assets, tangible or intangible (except possible liens for current state and local property taxes not in default); or (c) waive any rights of substantial value;

12.6.  The Seller has no written notice or actual knowledge of any pending or threatened condemnation, eminent domain, or similar proceeding affecting the Property or any portion thereof, or pending public improvements in, about or outside the Property which may in any manner detrimentally affect access to the Property.

**EXHIBIT A**

12.7. To the best of the Seller's knowledge, the execution and delivery of this Agreement, the consummation of the transactions herein contemplated and the current use of the Property will not conflict with any applicable law, ordinance, regulation, statute, rule, restriction or any judgment, order or decree of any court or agency having jurisdiction over the Seller or the Property.

12.8 To the best of Seller's knowledge, all labor performed upon or material furnished for the Property by or for the Seller has been paid for, and there exists no claim for which a mechanic's or materialman's lien or liens, or any other lien, can be claimed by any person or entity in respect of the Property resulting from activity by the Seller.

12.9 Each of the representations and warranties set forth in this Agreement by the Seller are true and correct as of the Effective Date and shall be true and correct on the Closing Date.

12.10    Seller has not received, and Seller has no knowledge of the presence of Hazardous Substances or violation of Environmental Laws on the Property or of  any notice of any correspondence, writ, injunction, decree, order or judgment outstanding or of any action instituted or threatened under or pursuant to, or of any violation of, any Environmental Law, including those relating to any Hazardous Substances or Petroleum Products applicable to the Parcel, including, without limitation, any notice from any governmental authority or other person advising Seller that it or any tenant of Seller is or is potentially responsible for response costs under CERCLA or any other Environmental Law with respect to a release or threatened release of any Hazardous Substances or Petroleum Products.

Seller has not received, and Seller has no knowledge of any tenant receiving, any notice writ, injunction, decree, order or judgment of any violation of any Environmental Law or any zoning, worker safety or land use Law relating to the operation of the Business, including, without limitation, under CERCLA, the Resource Conservation and Recovery Act, as amended (42 U.S.C. Section 6901, et seq.) (together with the regulations promulgated thereunder, "*RCRA*"), the Oil Pollution Act of 1990 (33 U.S.C. Section 2701, et seq.) (together with the regulations promulgated thereunder, "*OPA*"), the Emergency Planning and Community Right-to-Know Act, as amended (42 U.S.C. Section 11001, et seq.) (together with the regulations promulgated thereunder, "*Title III*"), the Clean Water Act, as amended (33 U.S.C. Section 3121, et seq.) (together with the regulations promulgated thereunder, "*CWA*"), the Clean Air Act, as amended (42 U.S.C. Section 7401, et seq.) (together with the regulations promulgated thereunder, "*CAA*"), the Toxic Substances Control Act, as amended (15 U.S.C. Section 2601, et seq.) (together with the regulations promulgated thereunder, "*TSCA*"), and any state or local similar Laws and any so-called local, state or Federal "superfund" or "superlien" law. Seller has not received any written or oral notice or other communication from any person (including but not limited to a governmental authority) relating to Hazardous Substances, Regulated Substances or Tanks, or remediation thereof, of possible liability of any person (including without limitation, Seller's tenant) pursuant to any Environmental Law, other environmental conditions in connection with the Parcel, or any

**EXHIBIT A**

actual or potential administrative or judicial proceedings in connection with any of the foregoing.

For purposes of this section, "**Environmental Laws**" means all federal, state, and local laws, statutes, ordinances, regulations, criteria, guidelines, rules of common law now or hereafter in effect, and in each case as amended, and any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment relating to the regulation and protection of human health, safety, the environment and natural resources (including, without limitation, ambient air, surface water, groundwater, wetlands, land, surface or subsurface strata, wildlife, aquatic species and vegetation), including without limitation, laws and regulations relating to emissions, discharges, releases or threatened releases of Hazardous Substances or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Substances.

For purposes of this section, "**Hazardous Substance**" means: (i) any petroleum or Petroleum Products, flammable explosives, radioactive materials, asbestos in any form that is or could become friable, urea formaldehyde foam insulation, transformers or other equipment that contain dielectric fluid containing levels of polychlorinated biphenyls, and radon gas; (ii) any chemicals, materials, substances or wastes which are now or hereafter become defined as or included in the definition of "hazardous substances," "hazardous wastes," "extremely hazardous wastes," "restricted hazardous wastes," "toxic substances," "toxic pollutants," or words of similar import, under any Environmental Law; (iii) any PCBs; and (iv) any other chemical, material, substance, or waste, exposure to which is now or hereafter prohibited, limited or regulated by any governmental authority.

For purposes of this section, "**Petroleum Products**" means gasoline, other petroleum products, by-products, additives, and constituents and their fractures.

Each of the representations and warranties set forth in this Agreement by the Seller are true and correct as of the Effective Date and shall be true and correct on the Closing Date, and shall survive Closing for a period of one (1) year.

**13. Disclaimer of Representations**. Buyer hereby expressly acknowledges and agrees that except as and to the extent expressly provided to the contrary in this Contract: seller makes and has made no warranty or representation whatsoever as to the condition or suitability of any portion of the Property or personal property for Buyer's purposes. The provisions of this Section shall survive Closing and delivery of the Deed.

**14. Radon**. RADON IS A NATURALLY OCCURRING RADIOACTIVE GAS THAT, WHEN IT HAS ACCUMULATED IN A BUILDING IN SUFFICIENT QUANTITIES, MAY PRESENT HEALTH RISKS TO PERSONS WHO ARE EXPOSED TO IT OVER TIME. LEVELS OF RADON THAT EXCEED FEDERAL AND STATE GUIDELINES HAVE BEEN FOUND IN BUILDINGS IN FLORIDA, ADDITIONAL INFORMATION REGARDING RADON AND

**EXHIBIT A**

**RADON TESTING MAY BE OBTAINED FROM THE COUNTY PUBLIC HEALTH UNIT**.

**15. Risk of Loss; Casualty; Eminent Domain**.

       15.1 Casualty.

       15.1.1Minor Damage.  In the event of loss or damage to the Property or any portion thereof (the **"premises in question"**) which is not **"major"** (as hereinafter defined), this Contract shall remain in full force and effect provided Seller performs any necessary repairs or, at Seller's option, reduces the cash portion of the Purchase Price in an amount equal to the cost of such repairs as determined by a licensed contractor mutually acceptable to Seller and Buyer, Seller thereby retaining all of Seller's right, title and interest to any claims and proceeds Seller may have with respect to any casualty insurance policies or condemnation awards relating to the premises in question.  In the event that Seller elects to perform repairs upon the Property, Seller shall use reasonable efforts to complete such repairs promptly and the date of Closing shall be extended a reasonable time in order to allow for the completion of such repairs.

       15.1.2 Major Damage.  In the event of a **"major"** loss or damage, either Seller or Buyer may terminate this Contract by written notice to the other party, in which event the Earnest Money shall be returned to Buyer.  If neither Seller nor Buyer elects to terminate this Contract within ten (10) days after Seller sends Buyer written notice of the occurrence of major loss or damage, then Seller and Buyer shall be deemed to have elected to proceed with Closing, in which event Seller shall, at Buyer's option, either (a) perform any necessary repairs, or (b) assign to Buyer all of Seller's right, title and interest to any claims and proceeds Seller may have with respect to any casualty insurance policies or condemnation awards relating to the premises in question and credit Buyer at Closing for the lesser of (x) the estimated casualty loss and (y) the amount of any deductible under such casualty insurance policies.  In the event that Seller elects to perform repairs upon the Property, Seller shall use reasonable efforts to complete such repairs promptly and the date of Closing shall be extended a reasonable time in order to allow for the completion of such repairs.  Upon Closing, full risk of loss with respect to the Property shall pass to Buyer. For purposes of Section 15, **"major"** loss or damage refers to the following:  (i) loss or damage to the Property or any portion thereof such that the cost of repairing or restoring the premises in question to a condition substantially identical to that of the premises in question prior to the event of damage would be, in the certified opinion of a mutually acceptable architect or engineer, equal to or greater than fifteen percent (15%) of the Purchase Price, and (ii) any loss due to a condemnation which permanently and materially impairs the current use of the Property.

**EXHIBIT A**

15.2 Eminent Domain. If, prior to the Closing, any material portion or all of the Property is taken by eminent domain, then Buyer shall have the option of (a) canceling this Contract, or (b) proceeding with the Closing and acquiring the Property as affected by such taking, together with all compensation and awards, and Seller will not settle any proceedings relating to such taking without Buyer's prior written consent, provided, however, that if Buyer elects to proceed with the Closing, Buyer shall not be entitled to any reduction of the Purchase Price and Seller shall deliver any condemnation proceeds, if any, or assign the right to receive same, and the rights to any other claims arising as a result of the damage, to Buyer at Closing. Seller shall promptly notify Buyer of any actual or threatened condemnation affecting the Property.

15.3 Cancellation. If this Contract is canceled pursuant to this Section, Escrow Agent shall promptly return the Deposit to Buyer, and the parties hereto shall thereafter be released from all further obligations and liabilities hereunder, except for those obligations of Buyer that survive Closing.

**16. Seller's Operation of Property**. Seller covenants and agrees that between the date hereof and the Closing Date it shall perform or observe the following with respect to the Property:

16.1 Seller will keep and maintain the Property in its present condition (ordinary wear and tear excepted), will not take any action which would violate or breach any zoning ordinance or building ordinances nor commit any waste or nuisance, and will promptly advise Buyer of any litigation, arbitration or administrative hearing before any governmental authorities concerning or affecting the Property arising or threatened after the Effective Date.

16.2 Seller shall, between the date hereof and the Closing Date, permit Buyer and its authorized representatives to inspect the Property at reasonable times. Buyer shall indemnify Seller from and against any loss, damage, cost or expense incurred by Seller as a result of Buyer's inspection of the Property, and Buyer shall, following any such inspections, promptly restore the Property to the condition existing immediately prior to such inspections.

16.3 Seller shall not seek or obtain a change in the zoning of the Property, or use of the Property, without prior written consent of Buyer during the pendency of this Contract.

**17. Representations and Warranties of Buyer**. Buyer hereby represents and warrants to Seller as follows:

**18. Intentionally Deleted.**

**19. Recordation**.  Buyer and Seller agree that this Contract shall not be recorded in any public records. The provisions of this Section shall survive Closing and delivery of the Deed.

**20. Remedies for Default**. If Buyer fails to perform any of the covenants, terms and conditions hereof, Seller shall receive the Deposit and interest earned thereon, if any, as liquidated damages as and for its sole remedy hereunder and thereafter, this Contract shall be deemed to be terminated and of no force and effect, except for those provisions that specifically survive termination. Seller waives all other remedies it may have against Buyer at law or in equity. Buyer acknowledges that Seller will take certain actions, forego opportunities and incur expenses related to and arising out of Seller's obligations and duties as contained in this Contract. Buyer further acknowledges, having been carefully advised by counsel at the time of the execution of this Contract, that the Deposit paid to Seller pursuant to the provisions hereof, represents a reasonable endeavor by the parties to ascertain that said sums would be the minimal damages suffered by Seller in the event of a default or breach hereof by Buyer. If Seller fails to perform any of the covenants hereof, Buyer may, at its option, if it is not in default hereunder, elect to either (i) to terminate this Contract by delivering written notice to Seller and Escrow Agent and receive a refund of the Deposit and a reimbursement of all reasonable out-of-pocket costs and expenses incurred by Buyer in connection herewith or (ii) pursue the remedy of specific performance, provided, however, that if a court of competent jurisdiction determines that the remedy for specific performance is not available to Buyer, then the Buyer shall have all remedies available to it at law or in equity, including, without limitation, the right to seek judgment against the Seller for actual contract damages. Buyer waives all other remedies it may have against Seller at law or in equity, including but not limited to actions for damages.

**21. Litigation**. In connection with any litigation arising out of this transaction, or the interpretation or enforcement of this Contract, the prevailing party shall be entitled to recover from the party not prevailing its actual costs and attorney, paralegal and experts' fees in connection with all proceedings and all levels of proceedings. This Section shall survive the Closing or the earlier termination of this Contract.

**22. Intentionally Deleted.**

**23. Notices**. All notices and other communications relating to this Contract shall be written and sent (a) by personal delivery, (b) by commercial courier, (c) certified United States Mail, return receipt requested, or (d) by fax or electronic transmission (email), with a copy by US mail, to the following addresses:

As to Seller:          The Gardens, LLC
                       Attn:  Donald Granatstein
                       410 North Orange Blossom Trail
                       Orlando, Florida  32805
                       Phone:  (407) 423-7227

**EXHIBIT A**

Email:_____

| | |
|---|---|
| with a copy to: | Brian M. Jones, Esq.<br>Shutts & Bowen LLP<br>300 South Orange Avenue, Suite 1000<br>Orlando, Florida  32801<br>Phone: (407) 835-6937<br>Email: bjones@shutts.com |
| As to Buyer: | Lion Gardens, LLC<br>Attn:  Ronald Simkins<br>301 West 41st Street<br>Suite 406<br>Miami Beach, Florida  33146<br>Phone: (305) 899-8184<br>Email: ronaldsimkins@aol.com |
| with a copy to: | Adam Zwecker, Esq.<br>Akerman LLP<br>98 SE 7th Street, 11th Floor<br>Miami, FL 33131<br>Phone: (305) 982-5616<br>Email: adam.zwecker@akerman.com |
| As to Escrow Agent/:<br>Title Agent: | Brian M. Jones, Esq.<br>Shutts & Bowen LLP<br>300 South Orange Avenue, Suite 1000<br>Orlando, Florida  32801<br>Phone: (407) 835-6937<br>bjones@shutts.com |

Notices shall be effective upon actual receipt. Any party may change the address to which notices are to be sent to such party by written notice to the other party(ies) specifying such change of address. Seller's and Buyer's attorneys and/or Buyer's broker, if applicable, at the election of Buyer, are hereby authorized to send and receive notices hereunder on behalf of their respective clients.

**24.  Interpretation**. This Contract shall he governed, construed, and enforced in accordance with the law of the State of Florida (excluding its conflicts of laws provisions). This Contract embodies the entire agreement between the parties and supersedes all prior and contemporaneous written, oral, implied, and express agreements and understandings relating to the Property. No covenant, agreement, representation or warranty, whether written or oral, made or executed by any party hereto or its agent shall bind any party hereto unless specifically set forth in this Contract. The provisions of this Contract may be waived or amended only by written instrument executed by the party

**EXHIBIT A**

against whom enforcement of the waiver or amendment is sought. The section headings herein contained are for the purposes of identification only and shall not be considered in construing this Contract. All of the parties to this Contract have participated freely in the negotiation and preparation of this Contract and this Contract shall not be more strictly construed against any one of the parties hereto. This Contract may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument. Electronically transmitted signatures shall be deemed originals. The terms "Seller" and "Buyer" shall include the heirs, executors, administrators, personal representatives, successors and assigns of the respective parties hereto. Whenever used the singular number shall include the plural and the plural the singular, and the use of any gender shall include all genders. No reference or use shall be made of any previous draft of this Contract or of any negotiations with respect thereto in construing this Contract. As used herein, the word "including" shall be construed to mean "including, without limitation."

**25. Broker**. Buyer and Seller warranty and represent that neither party has engages a real estate broker for this transaction and that no brokerage commission is due.  Each party agrees that should any claim be made for brokerage commissions or finder's fees by any broker or finder, through or on account of any acts of said party or its representatives, said party will hold the other party free and harmless from and against any and all loss, liability, cost, damage and expense in connection therewith.   The provisions of this paragraph shall survive Closing.

**26. Escrow Agent**. Escrow Agent is authorized and agrees by acceptance of the Deposit to hold and deliver the same or the proceeds thereof in accordance with this Contract. In the event of doubt as to its liabilities or duties, Escrow Agent may, in its sole discretion and any other provision of this Contract to the contrary notwithstanding, (a) continue to hold the Deposit or the proceeds thereof until the parties mutually agree to the disbursement thereof, or until a judgment of a court of competent jurisdiction shall determine the rights of the parties thereto, or (b) deliver the Deposit or the proceeds thereof to the Clerk of the Circuit Court for Orange County or the County, and, upon notifying all parties concerned of such action, any liability on the part of Escrow Agent shall fully terminate except to the extent of accounting for any monies or documents previously delivered out of escrow. The parties agree that Escrow Agent shall not be liable to anyone for erroneous delivery to Buyer or Seller of any money or document held in escrow unless such erroneous delivery shall be due to willful breach of this Contract or gross negligence on the part of Escrow Agent. Buyer and Seller each agrees to indemnify Escrow Agent against, and to hold Escrow Agent harmless from, any and all loss, cost or expense, including reasonable attorney, paralegal and expert fees and disbursements, resulting from Escrow Agent's performance of its obligations and exercise of its prerogatives hereunder. Escrow Agent shall not be liable for any loss resulting from any default, error, action or omission of Buyer or Seller, loss or impairment of funds in the course of collection or while on deposit resulting from failure or suspension of the depository institution, or Escrow Agent's compliance with any legal process, order or judgment of any court, whether or not subsequently vacated or modified. Buyer and Seller acknowledge that Escrow Agent shall not be liable for any loss arising from the fact that the common escrow account maintained by Escrow Agent for this and other

**EXHIBIT A**

matters may cause the aggregate amount of any individual depositor's account to exceed applicable deposit insurance coverage. Escrow Agent shall be permitted to resign, in which event the parties shall promptly appoint a substitute escrow agent and direct the Escrow Agent to transfer the Deposit to the substitute escrow agent. In the event of a dispute between Seller and Buyer under this Contract, including, without limitation, a dispute relating to the Deposit, Buyer agrees that the Escrow Agent may continue to serve as legal counsel to Seller in all matters relating to this Contract and otherwise. The provisions of this Section shall survive the Closing or the earlier termination of this Contract and may not be amended without the prior written consent of Escrow Agent.

27. **Severability**. This Contract is intended to be performed in accordance with, and only to the extent permitted by, applicable law. If any provision of this Contract or the application thereof to any person or circumstances shall be invalid or unenforceable for any reason, the remainder of this Contract and the application of such provision to other persons or circumstances shall not be affected and shall be enforced to the greatest extent permitted by law.

28. **Relationship**. Nothing contained in this Contract shall be construed to be or to create a partnership, joint venture, or relationship between Seller and Buyer other than as Buyer and Seller of the Property pursuant to this Contract. This Contract shall bind, inure to the benefit of, and be enforceable by the parties hereto and their respective heirs, personal representatives, successors and assigns.

29. **Confidentiality**. Buyer agrees to keep all discussions and negotiations with Seller, which shall include, without limitation, the terms of this Contract, and all information obtained by or provided to Buyer regarding the Property, in strict confidence and shall not disclose the same except to Buyer's attorneys or professional advisors who are actively and directly participating in the transaction, each of whom will be informed by Buyer of the confidential nature of this transaction and all discussions, negotiations and terms thereof, be provided with a copy of this provision, and agree to observe the same terms and conditions set forth herein as if specifically named a party hereto.

30. **Public Disclosure**. Prior to Closing, any release to the public of information by Buyer with respect to the matters set forth in this Contract will be made only in the form approved by Seller and its counsel.

31. **Assignment**. Buyer may not assign its rights under this Contract except with the prior written consent of Seller, which consent may be given or withheld in Seller's sole discretion. Seller may assign its rights under this Contract without the consent of Buyer, but Seller shall give the Title Agent notice of such assignment after it is accomplished and prior to Closing.

32. **Discharge of Obligations**. The acceptance of the Deed by Buyer shall be deemed to be a full performance and discharge of every representation and warranty made by Seller herein and every agreement and obligation on the part of Seller to be performed pursuant to the provisions of this Contract, except those, if any, which are herein specifically stated to survive Closing.

**EXHIBIT A**

**33. Time of Essence**.  Seller and Buyer agree that time is of the essence of this Contract.

**34. Submission, Effective Date**.  The submission by Seller to Buyer of this Contract in an unsigned form shall be deemed to be a submission solely for Buyer's consideration and review.  Such submission shall have no binding force and effect, shall not constitute an option or an offer, and shall not confer any rights upon either party or impose any obligations upon either party irrespective of any reliance thereon, change of position or partial performance unless and until Buyer and Seller shall have both executed this Contract and delivered the same to each other.  **"Effective Date"** means the last date that the last signatory for either Buyer or Seller executes this Contract.  Any reference in this Contract to a time period of less than six (6) days shall, in the computation thereof, exclude Saturdays, Sundays, and legal holidays.  Any time period provided for herein which ends on a Saturday, Sunday or legal holiday shall automatically extend through and including the next business day.

**35. Venue and Applicable Law**.  **THIS CONTRACT SHALL IN ALL RESPECTS BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE SUBSTANTIVE FEDERAL LAWS OF THE UNITED STATES AND THE LAWS OF THE STATE OF FLORIDA.  BUYER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT SITTING IN ORANGE COUNTY, FLORIDA, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS CONTRACT AND HEREBY IRREVOCABLY AGREES THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING SHALL BE HEARD AND DETERMINED IN A STATE OR FEDERAL COURT SITTING IN ORANGE COUNTY, FLORIDA. NOTHING CONTAINED IN THIS SECTION SHALL AFFECT THE RIGHT OF SELLER TO BRING ANY ACTION OR PROCEEDING AGAINST BUYER OR ITS PROPERTY IN THE COURTS OF ANY OTHER JURISDICTION. BUYER AND SELLER AGREE THAT THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE CLOSING OF THE TRANSACTION CONTEMPLATED BY THIS CONTRACT**.

**36. No Third Party Beneficiary**.  The provisions of this Contract and of the documents to be executed and delivered at Closing are and will be for the benefit of Seller and Buyer only and are not for the benefit of any third party, and accordingly, no third party shall have the right to enforce the provisions of this Contract or of the documents to be executed and delivered at Closing.

**37. Condition to Buyer's and Seller's Obligations**.

(a) Buyer and Seller acknowledge that Seller is a debtor in a bankruptcy: ***In Re:  The Gardens, LLC, Case No. 6:17-bk-04444-CCJ Middle District of Florida Bankruptcy Court,*** ("**Bankruptcy Case**").  Buyer and Seller further acknowledge that this Contract is contingent upon entry of a final order in the Bankruptcy Case; (i) approving the sale of the Property pursuant to this Contract; (ii) that the Property sold and conveyed to Buyer pursuant to this Contract shall be free and clear of all liens, encumbrances, claims, debts, and security interests (other than ad valorem taxes), (collectively referred to as

**EXHIBIT A**

"**Orders**").   The parties agree and stipulate the Closing Date shall be extended as necessary to obtain entry of the Orders, provided that, in no event shall the Closing Date be extended later than January 30, 2018 ("**Extended Closing Date**").   In the event Closing does not occur on or before the Extended Closing Date, then Buyer may (in its sole and absolute discretion) elect in writing prior to the expiration of the extended term to further extend the closing for up to two (2) additional periods of thirty (30) days, in the absence of which either party may terminate this Contract upon written notice upon which the Contract shall terminate, the Deposit shall be paid to Buyer and the parties released from further obligations hereunder.

**38.  Waiver of Jury Trial**.   **BUYER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT HE MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON THIS CONTRACT, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS CONTRACT OR ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONNECTION WITH THIS CONTRACT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY WITH RESPECT HERETO.   THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE SELLER'S ACCEPTING THIS CONTRACT FROM BUYER.   BUYER CONSENTS TO THE ISSUANCE AND SERVICE OF PROCESS UPON ANY OF ITS GENERAL PARTNERS, IF IT IS A PARTNERSHIP**.

**IN WITNESS WHEREOF**, Buyer and Seller have executed this Contract on the date first written above.

**WITNESSES**:                                    **SELLER:**

                                                   **THE GARDENS LLC,**
                                                   a Florida limited liability company

_____        By: _____
Printed Name: _____        Name: _____
                                                   Title: _____

_____
Printed Name: _____

**WITNESSES**:                                    **BUYER:**

                                                   **LION GARDENS, LLC,**
                                                   a Florida limited liability company

_____        By: _____
Printed Name: _____        Name: _____
                                                   Title: _____

_____
Printed Name: _____

## RECEIPT AND CONTRACT

The undersigned acknowledges receipt, subject to collection, of the Deposit in the amount of Five Thousand and No/100 Dollars ($5,000.00) as the Initial Deposit under the Contract for Sale and Purchase between The Gardens LLC**,** a Florida limited liability company, as Seller, and Lion Gardens, LLC, a Florida limited liability company, as Buyer, dated effective as of _____, 2017 (the **"Contract"**). The undersigned agrees to act as Escrow Agent pursuant to the terms of the Contract and to hold and disburse the Deposit in accordance with the Contract.

Executed by Escrow Agent on the date set forth below.

**ESCROW AGENT**:

**SHUTTS & BOWEN, LLP**

By:    _____

Name: _____

Title: _____

Date: _____

**EXHIBIT A**

**EXHIBIT "A"**

**<u>PROPERTY</u>**


**Cross Parcel:  T**he vacant parcel of real property located at 492 N. Orange Blossom  Trail, Orlando, Florida 32805 (Parcel No: 27-22-29-2946-01-001).

**Parking Lot:  T**he parcel of real property located at 300 N. Orange Blossom  Trail, Orlando, Florida 32805 (Parcel No: 27-22-29-7609-00-010).

**Trustee's Lot:  T**he  parcel of real property located at 424 N. Orange Blossom  Trail, Orlando, Florida 32805 (Parcel No: 27-22-29-2946-01-000).

**SCHEDULE 5.1.3**

**PERMITTED EXCEPTIONS**

Current and prior years ad valorem taxes.

**EXHIBIT A**